# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| QUINTEZ PARKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 C 1523 |
| | ) | |
| PHILLIP ROCK CENTER AND SCHOOL, | ) | Judge John Z. Lee |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Quintez Parks, an African-American man, has sued the Phillip Rock Center and School ("Rock Center"). Invoking Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. 2000e *et seq.*, Parks accuses the Rock Center of gender discrimination (Count I) and race discrimination (Count II). He also alleges that the Rock Center paid him less than similar female employees in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1), (Count III). The Rock Center has moved for summary judgment [58]. For the reasons below, that motion is granted in part and denied in part.

## Background

### I.  Factual Background[1]

#### A.  The AM Shift Coordinator Position

The Rock Center is a publicly-funded school that serves deaf-blind students. Pl.'s LR 56.1 Resp. Def.'s Stmt. Mat. Facts ("Pl.'s RSOF") ¶ 1, ECF No. 74. The Center teaches the students, tends to their medical needs, and transports them to mainstream schools. *Id.* ¶¶ 1, 20. To fulfill those responsibilities, the Center employs a forty-person staff. *Id.* ¶ 50. Half are African-American; only four or five are men. *Id.* ¶¶ 51–52.

Parks began working at the Rock Center as a part-time paraprofessional in May 2015. *Id.* ¶ 2. Charlene Bolden, an African-American woman who served as one of the Rock Center's supervisors, hired Parks into that position. *Id.* ¶¶ 4–5. Pleased with Parks's performance, Bolden made him a full-time paraprofessional soon after he started. *Id.* ¶ 6.

Continuing his rapid rise, Parks applied for and received a promotion to AM Shift Coordinator in August 2015, just three months after he started. *Id.* ¶ 7. In that role, Parks oversaw paraprofessionals, acted as a substitute teacher, and coordinated the schedules of up to eleven students. Def.'s LR 56.1 Resp. Pl.'s Stmt. Additional Facts ("Def.'s RSOF") ¶¶ 3, 6, ECF No. 83. Parks earned $18 an hour and worked the 7 a.m. to 3 p.m. shift. *Id.* ¶ 2.

---

[1]  The following facts are undisputed or have been deemed admitted, unless otherwise noted.

### B. The Rock Center's School Bus

To ferry its students to the mainstream schools that they sometimes attended, the Rock Center owned a full-size school bus. Pl.'s RSOF ¶ 9. According to the written job description, one of the AM Shift Coordinator's duties was to drive the bus. *Id*. ¶ 19. Under applicable law, only a driver who holds a Commercial Driver's License ("CDL") may operate a school bus. *Id*. ¶ 15; *see* 49 U.S.C. § 31302. For that reason, the job description called for the AM Shift Coordinator to obtain a CDL. *Id*. ¶ 16.

Soon after Parks started as AM Shift Coordinator, he sat for the written portion of the CDL test. *Id*. ¶ 31. He failed to pass. *Id*. ¶ 32. After that, Parks's supervisors told him that he no longer needed a CDL.[2] Def.'s RSOF *Id*. ¶ 13. He never took the test again. Pl.'s RSOF ¶ 34.

The Rock Center never disciplined Parks for failing to earn a CDL. Def.'s RSOF ¶ 18. Instead, it came up with other ways to get its students where they needed to go. For much of 2016, the Center enlisted Todnita Watson, a CDL holder, to drive the bus. Pl.'s RSOF ¶ 46. When Watson quit in January 2017, the School paid an outside company to supply a bus driver. *Id*. ¶ 49.

---

[2] The Rock Center suggests that this statement constitutes hearsay and is thus inadmissible. Def.'s Reply at 10, ECF No. 82. But Federal Rule of Evidence 801(d)(2)(D) permits the introduction of statements made by an opposing party's agent on a matter within the scope of their agency. Based on the current record, the Court concludes that the supervisor's remark satisfies Rule 801(d)(2)(D) and is admissible.

### C.     Parks's Termination

Not everyone at the Rock Center approved of Parks's performance as AM Shift Coordinator.  At times, Bolden—the supervisor who first hired and promoted Parks—criticized him.  Def.'s RSOF ¶ 11.  On several occasions, she stated that the White woman Parks replaced, Mary Romer, had done a better job.  *Id*.  Once, Bolden also complained that "when we had a wom[a]n in this position, we didn't have problems."  *Id*.; *see also* Def.'s Ex. 2, Parks Dep. at 121:20–122:14, ECF No. 54-4.

More than a year after Parks took on the Coordinator position, Seth Harkins, the CEO who hired him into that role, stepped down.  Pl.'s RSOF ¶ 4.  To replace Harkins, the Rock Center tapped Bolden to act as its interim Executive Director.  *Id*.  Shortly thereafter, Bolden fired Parks.  *Id*. ¶ 37.  In doing so, she explained that the AM Shift Coordinator was required to secure a CDL and that Parks had failed to do so.  *Id*.

## II.     Comparable Employees

To support his discrimination and unequal pay claims, Parks has highlighted two allegedly comparable employees: Mary Romer and Aliya Syed.

### A.     Mary Romer

Romer worked as the Rock Center's AM Shift Coordinator from January 2005 until May 2015, when Parks replaced her.  Pl.'s RSOF ¶ 58.  Although Romer was considered a supervisor, and Parks was not, he "did essentially the same task[s] previously assigned to [her]."  Def.'s RSOF ¶¶ 20, 21.  Before Romer left her position, she earned more than $40,000 per year.  *Id*. ¶ 22.

## B.  Aliya Syed

After Parks was fired, the Rock Center recruited Syed to serve as "Shift Coordinator." *Id.* ¶ 34.  While Parks and Syed both held bachelor's degrees, Syed also boasted certificates in education and speech pathology.  Pl.'s RSOF ¶¶ 54–56; Def.'s RSOF ¶ 3.  Like Parks, Syed managed paraprofessionals, transported students, served as a substitute teacher, and coordinated between parents, students, and staffers.  Def.'s RSOF ¶ 29.  Syed worked the same 7 a.m. to 3 p.m. shift as Parks and reported to the same supervisors.  *Id.* ¶¶ 26–27.

Still, some aspects of Syed's experience at the Rock Center differed.  For one thing, Syed was a salaried employee who earned $42,000 in her first year and $60,000 after two years on the job.  *Id.* ¶ 25.  For another, although Syed (like Parks) failed the CDL exam when she first sat for it, the Rock Center did not fire her.  *Id.* ¶ 33.  Instead, it gave her a second chance to pass the test, which she did. *Id.*  The table below compares Parks, Romer, and Syed.

*Table 1: Comparison of Rock Center Employees*

| Employee | Parks[3] | Romer[4] | Syed[5] |
|----------|----------|----------|---------|
| Title | AM Shift Coordinator | AM Shift Supervisor | Shift Coordinator |
| Salary | $18 an hour (roughly $36,000 a year) | Over $40,000 | $42,000 (starting salary), $60,000 (after two years) |
| Hours | 7 a.m. to 3 p.m. | 7 a.m. to 3 p.m. | 7 a.m. to 3 p.m. |
| Qualifications | Bachelor's degree | Ten years of experience | Bachelor's degree, certifications in education and speech pathology |

## III.    Procedural History

Convinced that the Rock Center discriminated against him because of his race and gender, Parks secured a right-to-sue letter from the EEOC. Pl.'s RSOF ¶ 33. Then he filed this lawsuit. After the close of fact discovery, the Rock Center moved for summary judgment. That motion is now before the Court.

## Legal Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing that there is no

---

[3]     *See* Pl.'s RSOF ¶ 7 (title), Def.'s RSOF ¶ 2 (salary), *id.* (hours), Pl.'s RSOF ¶ 3 (qualifications). The salary estimate assumes that a year includes fifty forty-hour work weeks.

[4]     *See* Pl.'s RSOF ¶ 58 (title), Def.'s RSOF ¶ 22 (salary), *id.* ¶ 20 (hours), Pl.'s RSOF ¶ 58 (qualifications).

[5]     *See* Def.'s RSOF ¶ 34 (title), Def.'s RSOF ¶ 25 (salary), *id.* ¶ 27 (hours), Pl.'s RSOF ¶¶ 54–56 (qualifications).

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmovant must then set forth specific facts demonstrating that there are disputed material facts that must be decided at trial. *Id.* at 321–22.

## Analysis

Parks claims that the Rock Center engaged in race and gender discrimination in violation of Title VII (Counts I and II) along with wage discrimination in violation of the Equal Pay Act (Count III). The Rock Center urges the Court to grant summary judgment in its favor as to each count.

## I. The Admissibility of the Pausche Affidavit

As a threshold matter, Parks challenges the admissibility of a declaration submitted by Peggy Pausche, the Rock Center's executive administrative assistant.[6] *See* Def.'s Ex. 3, Pausche Decl. ("Pausche Decl."), ECF No. 58-4. More specifically, he insists that Pausche's statement "is not based upon personal knowledge; it draws conclusions; and is not made under penalty of perjury."[7] *See* Pl.'s LR 56.1 Stmt. Mat. Fact. ("Pl.'s SOF") ¶ 8 n.1, ECF No. 58-3. Two of those arguments miss the

---

[6] Parks also posits that "the Affidavit of Bonnie Jordan does not comply with the requirements of an affidavit." Pl.'s Stmt. Mat'l Facts ("Pl.'s SOF") ¶ 61, ECF No. 74. Because Parks does not pinpoint any deficiencies in that declaration, this objection is overruled.

[7] Although Parks invokes Illinois Supreme Court Rule 191(a), the Federal Rules of Civil Procedure and Federal Rules of Evidence govern this issue. *See Park v. City of Chi.*, 297 F.3d 606, 612 (7th Cir. 2002) ("[M]atters of practice and procedure are governed by federal law."). As relevant here, Federal Rule of Civil Procedure 56(c)(4) dictates that "[a]n affidavit or declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

mark entirely. Contrary to Parks's suggestion, Pausche made her declaration under oath. And Parks fails to identify any impermissible conclusions.

Parks's personal knowledge argument is more complicated. As her supplemental affidavit explains, Pausche served as human resources administrator, as well as executive assistant, at the Rock Center. *See* Pausche Suppl. Decl. ¶¶ 1–6, ECF No. 84-1. In that role, Pausche would be familiar with employees' qualifications, salaries, and job descriptions. *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 852 (N.D. Ill. 2018) ("[I]t may sometimes be inferred that the affiant had knowledge of certain events based upon his position within an organization.") (citation omitted). Accordingly, Parks's objection to the admissibility of Pausche's testimony as to those facts is overruled.

To the extent that Pausche opines about how the Rock Center determined employees' salaries, however, Parks's objection rests on firmer ground. *See* Pausche Decl. ¶¶ 29, 31. Pausche claims "personal knowledge concerning all matters concerning the hiring, pay, evaluation, discipline, and separation of all employees." Pausche Suppl. Decl. ¶ 3. But while "[p]ersonal knowledge includes inferences and opinions," they "must be grounded in observation or other first-hand personal experience." *Uncommon*, 305 F. Supp. 3d at 851–52. And, although Pausche's position as HR administrator suggests that she knew *what* employees' salaries were, it does not establish that she knew *how* those salaries were determined. Notably, nothing in the record shows that Pausche played a role in interviewing and hiring employees—the typical times when salary decisions are made. *See* Parks

Dep. at 55:10–55:12 ("[Pausche] wasn't even involved in anything, only to make sure I had the right paper work.").

In sum, although Pausche claims to know how the Rock Center set employees' salaries, her declaration "fails to indicate any factual basis which would tend to show that [s]he had personal knowledge of the matter." *Davis v. City of Chi.*, 841 F.2d 186, 189 (7th Cir. 1988). As such, her statements as to that issue are inadmissible. *See Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) ("[R]esponses that . . . are not based on personal knowledge . . . will not be considered."). In all other respects, Parks's objection is overruled, and the factual statements that Parks disputed on this basis are deemed admitted.

## II.     Race and Gender Discrimination

Parks claims that the Rock Center discriminated against him based on his race or gender in violation of Title VII. To survive a motion for summary judgment, a Title VII claimant must produce enough evidence for a reasonable factfinder to conclude that "the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because Parks's race and gender discrimination claims both turn on this standard, the Court analyzes the claims together. *See e.g.*, *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337–38 (7th Cir. 2002) (adopting this approach).

One of the ways that a plaintiff can support a Title VII claim—although not the only one—is by using the framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, an employee must present evidence that "(1) [ ]he is a member of a protected class, (2) [ ]he was meeting the [employer's] legitimate expectations, (3) [ ]he suffered an adverse employment action, and (4) similarly situated employees outside of h[is] protected class were treated more favorably." *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019). In a reverse discrimination case, the first element is satisfied only if "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against [men] . . . or evidence that there is something 'fishy' about the facts at hand." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (citation omitted).

If an employee establishes all four elements, the employer "must then provide a nondiscriminatory reason for the employment action." *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 662 (7th Cir. 2011). In turn, if the employer does so, "the burden shifts back to [the employee], who must show that a jury could find that the proffered reason is pretextual." *Id.* Given that the parties primarily focus their arguments on the *McDonnell Douglas* framework, the Court does as well.

In articulating his Title VII claims, Parks outlines three distinct theories. *See* Am. Compl. ¶¶ 30–32, 36–38, ECF No. 50. First, he submits that the Rock Center declined to make him a supervisor because of his race or gender. Second, he contends that the Center fired him for the same reason. Finally, he maintains that

discrimination also explains the Center's refusal to pay him as much as Romer and Syed. The Court analyzes each theory in turn.

### A. Promotion

Parks first argues that the Rock Center's refusal to appoint him as a supervisor constitutes race or gender discrimination. To support such a claim, Parks must show that "not receiving the [supervisor] position is a materially adverse employment action." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). As a general matter, only the denial of a title that carries improved benefits, responsibilities, or working conditions counts as an adverse action. *See Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1005 (7th Cir. 2018).

But Parks admits that he performed the same responsibilities and experienced the same working conditions as supervisors, such as Romer and Syed. *See, e.g.*, Pl.'s LR 56.1 Stmt. Addtl. Facts ("Pl.'s SOAF") ¶ 21, ECF No. 75 (asserting that Parks "performed the same duties as Romer"). And nowhere does he claim that the supervisor title came with a higher salary. To the contrary, he concedes that at least one supervisor earned the same amount of money as he did. *See* Parks Dep. 108:12–108:20 (a supervisor named Kristin earned $18 per hour). In any event, the Rock Center has advanced a legitimate justification for refusing to treat Parks as a supervisor—namely, his lack of a Type 75 teaching certificate—that he has done nothing to rebut. Def.'s RSOF ¶ 21. The result is that the Rock Center is entitled to summary judgment as to Parks's failure-to-promote theory.

### B.    Termination

Next, Parks complains that the Rock Center fired him because of his race or gender.  In response, the Rock Center maintains that Parks has failed to support the first, second, and fourth elements of the *McDonnell Douglas* framework.

### 1.    Background Circumstances

As an initial matter, the Rock Center highlights a hurdle that only applies to Parks's gender discrimination claim.  "Because it is the unusual employer who discriminates against majority employees," the Seventh Circuit has cautioned, "a male plaintiff alleging gender discrimination must show something more than the fact that he is gendered."  *Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005) (citation omitted).  "Rather," the court continued, "the plaintiff in such cases must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [men] or evidence that there is something 'fishy' about the facts."  *Id.* (citations and quotation marks omitted).

For two reasons, Parks has done enough to survive summary judgment as to this requirement.  First, "expressing an interest in hiring women as opposed to men [qualifies as] a fishy background fact."  *Dorson v. Z2 Sys., Inc.*, No. 19-CV-01650, 2019 WL 4824225, at *2 (N.D. Ill. Oct. 1, 2019) (citation omitted).  When Bolden warned Parks that "when we had a wom[a]n in th[e] [Shift Coordinator] position, we didn't have problems," she did just that.  Def.'s RSOF ¶ 11.  Second, it is well-established that the "background circumstance threshold is lower than that

necessary for the discrimination claim as whole." *Lupescu v. Napolitano*, 700 F. Supp. 2d. 962, 975 (N.D. Ill. 2010); *see Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 822 (7th Cir. 2006) (recognizing that facts that "create the same inference of discrimination . . . [as] the more straightforward discrimination cases" meet the background circumstances requirement). As explained below, a reasonable jury could classify the Rock Center's stated reason for firing Parks as pretextual. Because Parks clears that relatively high bar, he also satisfies the less demanding "fishy"-facts requirement.

### 2.   Legitimate Expectations and Pretext

Turning to the issue of pretext, the Rock Center points out that Parks's job performance fell short of its legitimate expectations. There is no doubt that the Rock Center has highlighted a non-discriminatory expectation that Parks failed to meet. Indeed, the parties agree that the AM Shift Coordinator job description called for Parks to secure a CDL, Pl.'s RSOF ¶ 16, that he never did, *id.* ¶ 34, and that Bolden justified her decision to fire him on that basis, *id.* ¶ 37.

Most of the time, "if a plaintiff is unable to establish a prima facie case of employment discrimination under the *McDonnell Douglas* inquiry, an employer [will] not be subjected to a pretext inquiry." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014). But when "the employer asserts as the nondiscriminatory reason for termination that an employee was not meeting legitimate job expectations," then "[that issue] and the question of pretext overlap." *Id.* Given that the Rock Center has advanced a legitimate reason for discharging Parks, "the

burden toggles back to him" to "rais[e] a genuine issue about the honesty, not the accuracy, of [that] stated reason." *Widmar*, 772 F.3d at 465; *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013) ("An inquiry into pretext requires that [courts] evaluate the honesty of the employer's explanation, rather than its validity or reasonableness.").

Measured against that yardstick, Parks has presented enough evidence for a reasonable jury to disbelieve the Rock Center's stated reason for firing him. Most important, although both Parks and Syed flunked the CDL test on the first try, the Rock Center dismissed Parks, but gave Syed a second chance. That "inconsistency" would permit a rational factfinder to infer that the Rock Center fabricated the reason for dismissal. *Bates v. City of Chi.*, 726 F.3d 951, 956 (7th Cir. 2013). And, despite Parks's failure to obtain a CDL, the Rock Center declined to discipline him for more than a year and never even instructed him to retake the test. Pl.'s RSOF ¶¶ 2, 48, 51. Viewed in the light most favorable to Parks, those decisions suggest that securing a CDL was not an important part of Parks's job, and thus not the real reason he was fired. Because a reasonable jury could doubt the Rock Center's proffered justification, Parks has done enough to meet his burden as to the pretext requirement.

### 3.     Similarly-Situated Employees

Turning to the final element, the Rock Center insists that Parks has failed to spotlight "[a] similarly situated employee, outside of [his] protected class, [who] was treated more favorably." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th

Cir. 2014).  To satisfy this element, the "similarly situated employee must be directly comparable to the plaintiff in all material respects."  *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (citations omitted).

Here, Parks highlights two employees who he believes are comparable: Mary Romer and Aliya Syed.  Both are women; neither is African-American.  Romer is not comparable, however, because she held a CDL, the qualification Parks lacked.  Pl.'s RSOF ¶ 39.  But while Romer is not a useful comparator, Syed is.  Like Parks, Syed lacked a CDL when she started at the Rock Center.  Def.'s RSOF ¶ 33.  She also worked the same hours as Parks (the 7 a.m. to 3 p.m. shift), held a similar title ("Shift Coordinator" compared with "AM Shift Coordinator"), and replaced him when he was fired.  *Id.* ¶¶ 27, 28; Pl.'s Ex. 3, Syed Dep. at 24:17–25:6, ECF No. 76.

The Rock Center argues that Parks and Syed are not comparable for three reasons.  First, it identifies differences between the written job descriptions for the AM Shift Coordinator and the Shift Coordinator.  But, as the Rock Center concedes, comparability hinges on "real-world experience, not . . . job descriptions."  Def.'s Reply at 6, ECF No. 82; *see Alexander*, 739 F.3d at 981 ("This is a common-sense analysis, not an inflexible requirement that requires near one-to-one mapping between employees.") (citation and quotation marks omitted).

Second, the Rock Center stresses that while Syed maintained certifications in education and speech pathology, Parks did not.  *See* Pl.'s RSOF ¶ 7.  Yet "the similarly situated co-worker inquiry is a search for a substantially similar employee, not a clone."  *Weber v. Univ. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th

Cir. 2010) (citation and quotation marks omitted). And, during her deposition, Syed admitted that she earned her certificates by repeating coursework she had completed as part of her bachelor's degree. *See* Syed Dep. at 10:7–12:22 ("I redid all the course work."). Under those circumstances, a reasonable jury could find that Parks—who also had a bachelor's degree—held comparable qualifications.

Third, the Rock Center makes much of Syed's detailed discussion of her day-to-day tasks during her deposition. Among other responsibilities, Syed cleaned up after children, served as a substitute teacher, managed paraprofessionals' hours, and coordinated between students, patients, and doctors. *See* Syed Dep. at 26:3–30:7. But Parks performed equivalent duties, including "overseeing paraprofessionals," "transitioning . . . staff and paraprofessionals to the outside schools" and "acting as a substitute teacher."[8] Parks Dep. at 26:18–27:4. As a result, a jury could decide that Parks and Syed are similar enough that the Rock Center's favorable treatment of Syed suggests that it discriminated against Parks.

Ultimately, drawing all reasonable inferences in Parks's favor, a factfinder could conclude that the Rock Center dismissed him because of his race or gender. For that reason, his Title VII termination claim withstands summary judgment.

---

[8] Parks submitted a supplemental declaration averring that he performed the same duties that Syed described in her deposition. *See* Pl.'s Ex. 1, Parks Decl. ¶ 14, ECF No. 76. The Rock Center casts that declaration as an improper disavowal of Parks's deposition testimony. Because a reasonable factfinder could conclude that Parks and Syed had similar responsibilities without reviewing Parks's declaration, the Court sees no need to reach this issue.

## C.    Salary

Parks also submits that the Rock Center paid him less than Romer and Syed as a result of his race or gender.[9] To make out such a claim under Title VII, a plaintiff "must allege that h[is] lower pay was a result of discrimination." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 656 (7th Cir. 2010) (citing 42 U.S.C. § 2000e-2(a)(1)). "If the employer articulates a nondiscriminatory reason for the pay discrepancy, the plaintiff must prove that the employer's justification was pretext for a decision made on prohibited criteria." *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 910 (7th Cir. 2017).

While there is no dispute that Romer and Syed earned more than Parks, *see* Def.'s RSOF ¶¶ 2, 22, 25, the Rock Center has highlighted non-discriminatory explanations for that discrepancy. First, whereas Romer had ten years of experience as AM Shift Supervisor, Parks had none, Def.'s LR 56.1 Stmt. Mat. Fact ("Def.'s SOF") ¶¶ 2, 61, ECF No. 58-3. Second, Syed held certificates in education and speech pathology, *id.* ¶ 57, but Parks did not.

Although Parks has done nothing to paint Romer's experience as a pretextual explanation for her higher salary, a reasonable jury could disbelieve the Rock Center's stated reason for paying Syed more than Parks. When she started as Shift Coordinator, Syed earned a $42,000 salary. Def.'s RSOF ¶ 25. By contrast, Parks

---

[9]    As discussed below, Parks also raises a claim under the Equal Pay Act. As the Seventh Circuit has acknowledged, "even if the plaintiff's Equal Pay Act and Title VII claims [are] identical, Title VII is an independent remedy, in that it may be pursued in conjunction with other remedies." *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 703 (7th Cir. 2003).

made $18 an hour, which adds up to $36,000 per year (assuming he worked five eight-hour shifts each week for fifty weeks). *Id.* ¶ 2. That means that the Rock Center paid Syed about $6,000 (roughly 17%) more than Parks.

Whether Syed's education and speech pathology certificates justify that difference is a question that a jury must answer. Again, those certificates reflect bachelor's degree classes that Syed repeated, so they do not necessarily signal that she had completed any more coursework than Parks. *See* Syed Dep. 10:7–12:22. And neither party has introduced evidence about the extent to which those certificates were relevant to Syed's day-to-day work. Making all reasonable inferences in Parks's favor, a jury could conclude that those certificates were not the real reason for the salary discrepancy.

To review, although Parks's failure-to-promote theory must be dismissed, his Title VII termination and unequal pay claims survive summary judgment.

## III.   Equal Pay Act

In Count III, Parks alleges the Rock Center violated the Equal Pay Act. To sustain such a claim, "a plaintiff must establish (1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Fallon v. State of Ill.,* 882 F.2d 1206, 1208–09 (7th Cir. 1989) (citing 29 U.S.C. § 206(d)(1)). "Equal work means that the jobs share a common core of tasks and that there are no additional tasks that make the jobs substantially different." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 230 (7th

Cir. 2017).  Once a plaintiff presents a prima facie case, "the employer may respond with affirmative defenses to show the pay differential is due to: (1) a seniority system; a (2) merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Fallon*, 882 F.2d at 1211.

The first question is whether Parks's EPA claim is timely.  The Act dictates that "every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years."  29 U.S.C. § 255(a). Because Parks assumed the role of AM Coordinator in August 2015, Pl.'s RSOF ¶ 2, and because he waited to file an amended complaint that invoked the Equal Pay Act until May 2019, *see* Am. Compl ¶¶ 39–42, ECF No. 50, the Rock Center casts that claim as time-barred.

But, as Parks points out, the EPA claim relates back to his original complaint, which was filed in February 2018—about a year after his termination. *See* Fed. R. Civ. P. 15(c)(1)(B) (allowing relation-back when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading").  It follows that some of the paychecks that allegedly reflected discriminatory compensation fell within the two-year limitations period. *See Macaddino v. Inland Am. Retail Mgmt., LLC,* No. 12 C 8655, 2015 WL 1281475, at *9 (N.D. Ill. Mar. 18, 2015) ("Under what is called the Lily Ledbetter law, codified at 42 U.S.C. § 2000e–5(e)(3)(A), when an employee is affected by application of a

discriminatory compensation decision or other practice, a new unlawful employment practice occurs even though the discriminatory decision was made long before."). Tellingly, the Rock Center's reply brief offers no response to this argument.

The next question is whether Parks has made out a *prima facie* EPA claim. Because all three elements are present, the answer is yes. First, the Rock Center paid Romer and Syed more than Parks. *See* Def.'s SOF ¶¶ 22, 25, 33. Second, the Court already has found that Parks, Romer, and Syed performed comparable work. *See Nuzzi v. Bourbonnais Elementary Sch. Dist.*, 360 Fed. Appx. 664, 667 (7th Cir. 2010) (treating Title VII's similarly-situated requirement and the Equal Pay Act's equal work requirement as coextensive); *Fallon*, 882 F.2d at 1208 ("The work need not be identical; it is sufficient if the duties are 'substantially equal.'") (citation omitted). Third, neither side disputes that Parks, Romer, and Syed experienced similar working conditions. *See, e.g.*, Def.'s RSOF ¶ 20 (admitting that Parks replaced Romer).

Echoing an earlier argument, the Rock Center asserts that Romer's long experience and Syed's superior credentials explain why they earned more than Parks. Under the Equal Pay Act, however, it is not enough for an employer "to articulate education and experience as potentially explanatory variables." *See King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012). "That's part of the burden-shifting approach under Title VII," the Seventh Circuit has warned, "but is not the way the Equal Pay Act is written." *Id.* Rather, the employer must "prov[e] that [those variables] *actually* account for the difference." *Id.*

The Rock Center has not done that. Indeed, the only evidence it puts forward on this point derives from Pausche's declaration. "Syed's rate of pay," Pausche avers, "was set based upon her previous experience in teaching and based on her certifications." Pausche Decl. ¶ 29. "Romer's wages," Pausche adds, "increased over time based upon . . . her experience." *Id.* ¶ 31. But, as explained earlier, because nothing in the record suggests that Pausche had personal knowledge about how the Rock Center determined these salaries, those statements are inadmissible.

Aside from Pausche's declaration, the record is devoid of evidence about whether the salary differences are "actually" attributable to education and experience. *King*, 678 F.3d at 474. Conspicuously absent is any testimony from Harkins or Bolden, the leaders who hired Parks and Syed, and thus the two people most likely to have determined their salaries. Ultimately, the Rock Center has not carried its burden of showing that any reasonable jury would find that education and experience accounted for the pay discrepancy. As such, Parks's EPA claim withstands summary judgment.

## **Conclusion**

For the reasons stated above, the Rock Center's motion for summary judgment is granted in part and denied in part. That motion is granted as to Parks's Title VII failure-to-promote claim but denied in all other respects. A status hearing is set for 4/22/20 at 9:15 a.m. at which time the parties should be prepared to set deadlines for pretrial filings, a date for the pretrial conference, and a date for trial.

**IT IS HEREBY ORDERED.**             ENTER: 3/19/20

_____
**JOHN Z. LEE**
**United States District Judge**